UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
____

DeMarcus T. Young,

                Plaintiff,                Case No. 2:20-cv-68

v.                                          Honorable Robert J. Jonker

Gretchen Whitmer et al.,

                Defendants.
_____/

**OPINION**

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

**Discussion**

**I.    Factual allegations**

        Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan.

The events about which he complains occurred at that facility. Plaintiff sues Governor Gretchen Whitmer, MDOC Director Heidi Washington, and Warden Connie Horton.

Plaintiff lists Maurice Haynes and Charles E. Payton as plaintiffs in this case. However, Maurice Haynes and Charles E. Payton failed to sign this complaint. The federal courts uniformly reject representation during litigation by unlicensed lay people. *See e.g. Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41 (1st Cir. 1982) (prisoners); *Cheung v. Youth Orchestra Foundation of Buffalo, Inc.*, 906 F.2d 59 (2d Cir. 1990) (parent/child); *Bonacci v. Kindt*, 868 F.2d 1442 (5th Cir. 1989). *See also United States v. Whitesel*, 543 F.2d 1176 (6th Cir. 1976), *cert. denied* 431 U.S. 967 (1977) (rule applied in criminal matter). A person may appear in the federal courts only *pro se* or through legal counsel. 28 U.S.C. 1654. This Court's local rules prohibit representation by non-lawyers. W.D. Mich. L.R. 18(a). Therefore, Maurice Haynes and Charles E. Payton are not parties to this action.

Plaintiff also attaches a list of names and signatures of other prisoners to his complaint as an exhibit. (ECF No. 1-2, PageID.17-20.) Plaintiff states that these prisoners are joining him in the action and states that he is reserving the right to modify the classes of prisoners he is including in his complaint. (ECF No. 1, PageID.7.) However, Plaintiff does not include the names or reference the prisoners in the body of his complaint. Nor did any other prisoner file an application to proceed IFP. The list itself does not declare that the signatories are plaintiffs. Instead it appears that Plaintiff is attempting to file a class action in which he seeks to represent the rights of vulnerable prisoners within the MDOC.

Plaintiff alleges that he is a medically vulnerable prisoner and that he and other prisoners have raised their concerns regarding the danger of infection from COVID-19 with their Unit Block Representative. However, Plaintiff Young does not allege any specific facts regarding his age or any preexisting medical conditions. According to the MDOC's Offender Tracking System (OTIS), Plaintiff Young was born on June 18, 1991, and is currently twenty-nine years old. *See*

http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=753683. Plaintiff is 5 feet and 9 inches tall and weighs 179 pounds. *Id.*

Plaintiff states that on March 10, 2020, the Michigan Department of Health and Human Services identified the first two positive cases of COVID-19 in Michigan. On the same date, Governor Whitmer issued an executive order declaring a state of emergency, which stated that the best way to prevent the spread of COVID-19 is to maintain a distance of 6 feet between other people, to wear masks, and to frequently clean hands and surfaces. Plaintiff alleges that although the MDOC has instituted certain procedures to protect inmates, they do not adequately protect prisoners. Plaintiff states that ventilation, heating, cleaning and sanitary supplies, personal hygiene supplies, personal protective equipment, and the ability to socially distance are all inadequate.

Plaintiff states that the Defendants failure to properly address the continued danger of contracting COVID-19 violates his due process rights under the Fifth and Fourteenth Amendments, and his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff seeks early release from prison for eligible prisoners, home confinement and community placement for other prisoners, and modified prison environment to allow for social distancing. Plaintiff also seeks adequate cleaning and personal hygiene supplies. Finally, Plaintiff seeks compensatory and punitive damages.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a

3

claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III. Class Action

As noted above, Plaintiff appears to be attempting to assert a class action, which the Court construes as a request for class certification. For a case to proceed as a class action, the court must be satisfied on a number of grounds, including the adequacy of class representation. *See* Fed. R. Civ. P. 23(a)(4). It is well established that *pro se* litigants are inappropriate representatives of the interests of others. *See Garrison v. Mich. Dep't of Corr.*, 333 F. App'x 914, 919 (6th Cir. 2009) (citing *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975)); *see also Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008); *Ziegler v. Michigan*, 59 F. App'x 622, 624 (6th Cir. 2003);

4

*Palasty v. Hawk*, 15 F. App'x 197, 200 (6th Cir. 2001); *Howard v. Dougan*, No. 99-2232, 2000 WL 876770, at *1 (6th Cir. June 23, 2000). Because Plaintiff is an incarcerated *pro se* litigant, the Court finds that he is not an appropriate representative of a class. Therefore, the Court will deny Plaintiff's request for class certification.

### IV. Request for Release from Prison

To the extent that Plaintiff is seeking to be released from prison, he is not entitled to relief under § 1983. A challenge to the fact or duration of confinement should be brought as a petition for habeas corpus and is not the proper subject of a civil rights action brought pursuant to § 1983. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (holding that, "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"). Therefore, to the extent that Plaintiff's complaint challenges the fact or duration of his incarceration, it must be dismissed.

### V. Eighth Amendment

Plaintiff's allegations do not rise to the level of an Eighth Amendment violation. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while

5

incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

In a recent case brought by federal prisoners under 28 U.S.C. § 2241, the Sixth Circuit addressed the issue of whether the Bureau of Prisons (BOP) violated the Eighth Amendment rights of medically vulnerable inmates at the Elkton Federal Correctional Institution by failing to adequately protect them from COVID-19 infection. *Wilson, et al. v. Williams, et al.,* Case No. 20-3447, _ F.3d _, 2020 WL 3056217 (6th Cir. Jun. 9, 2020). In the opinion, the Sixth Circuit found that the plaintiffs in *Wilson* had easily satisfied the objective component of an Eighth Amendment claim:

> In assessing the objective prong, we ask whether petitioners have provided evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The COVID-19 virus creates a substantial risk of serious harm leading to pneumonia, respiratory failure, or death. The BOP acknowledges that "[t]he health risks posed by COIVD-19 are significant." CA6 R. 35, Appellant Br., PageID 42. The infection and fatality rates at Elkton have borne out the serious risk of COVID-19, despite the BOP's efforts. The transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death. Petitioners have put forth sufficient evidence that they are "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

*Id.*, at *7.

The Sixth Circuit went on to address the subjective prong of an Eighth Amendment claim, noting that the pertinent question was whether the BOP's actions demonstrated deliberate indifference to the serious risk of harm posed by COVID-19 in the prison. *Id.*

> There is no question that the BOP was aware of and understood the potential risk of serious harm to inmates at Elkton through exposure to the COVID-19 virus. As of April 22, fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died. "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). The BOP acknowledged the risk from COVID-19 and implemented a six-phase plan to mitigate the risk of COVID-19 spreading at Elkton.
>
> The key inquiry is whether the BOP "responded reasonably to th[is] risk." *Farmer*, 511 U.S. at 844. The BOP contends that it has acted "assiduously to protect inmates from the risks of COVID-19, to the extent possible." CA6 R. 35, Appellant Br., PageID 42. These actions include
>
>> implement[ing] measures to screen inmates for the virus; isolat[ing] and quarantin[ing] inmates who may have contracted the virus; limit[ing] inmates' movement from their residential areas and otherwise limit[ing] group gatherings; conduct[ing] testing in accordance with CDC guidance; limit[ing] staff and visitors and subject[ing] them to enhanced screening; clean[ing] common areas and giv[ing] inmates disinfectant to clean their cells; provid[ing] inmates continuous access to sinks, water, and soap; educat[ing] staff and inmates about ways to avoid contracting and transmitting the virus; and provid[ing] masks to inmates and various other personal protective equipment to staff.
>
> *Id.* at 42-43. The BOP argues that these actions show it has responded reasonably to the risk posed by COVID-19 and that the conditions at Elkton cannot be found to violate the Eighth Amendment. We agree.
>
> Here, while the harm imposed by COVID-19 on inmates at Elkton "ultimately [is] not averted," the BOP has "responded reasonably to the risk" and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights. *Farmer*, 511 U.S. at 844. The BOP implemented a six-phase action plan to reduce the risk of COVID-19 spread at Elkton. Before the district court granted the preliminary injunction at issue, the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, and providing masks. The BOP initially struggled to scale up its testing capacity just before the district court issued the preliminary injunction, but even there the BOP represented that it was on the cusp of expanding testing. The BOP's efforts to expand testing demonstrate the opposite of a disregard of a serious health risk.

*Id.* at *8.

In its decision, the Sixth Circuit noted that other Sixth Circuit decisions have found similar responses by prison officials and medical personnel, such as cleaning cells, quarantining infected inmates, and distributing information about a disease in an effort to prevent spread, to be reasonable. *Id.* at *8-9 (*citing Wooler v. Hickman Cty.*, 377 F. App'x 502, 506 (6th Cir. 2010); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448-49 (6th Cir. 2014); *Harrison v. Ash*, 539 F.3d 510, 519-20 (6th Cir. 2008); *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018). The *Wilson* Court also noted that other circuits had concluded that similar actions by prison officials demonstrated a reasonable response to the risk posed by COVID-19. *Wilson*, 2020 WL 3056217 at *9.

> In *Swain* [*v. Junior*], the Eleventh Circuit granted a stay of a preliminary injunction pending appeal on state inmates' Eighth Amendment claims. 958 F.3d [1081] at 1085 [(11th Cir. 2020) (per curiam)]. The Eleventh Circuit held that "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence,'" and "the evidence supports that [Metro West Detention Center ("MWDC") is] taking the risk of COVID-19 seriously." *Id.* at 1088-90 (citation omitted). In response to the pandemic in early March, MWDC began "cancelling inmate visitation; screening arrestees, inmates, and staff; and advising staff of use of protective equipment and sanitation practices" and, after reviewing further CDC guidance, began "daily temperature screenings of all persons entering Metro West, establish[ed] a 'COVID-19 Incident Command Center and Response Line' to track testing and identify close contacts with the virus, develop[ed] a social hygiene campaign, and mandate[d] that staff and inmates wear protective masks at all times." *Id.* at 1085-86. The Eleventh Circuit held that, because MWDC "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting [physical] distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures," MWDC's actions likely did not amount to deliberate indifference. *Id.* at 1090.
>
> Similarly, the Fifth Circuit granted stays of two preliminary injunctions in *Valentine* [*v. Collier,* 956 F.3d 797 (5th Cir. 2020) (per curiam)] and *Marlowe* [*v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)]. In *Valentine*, inmates at Texas's Wallace Pack Unit filed a class action suit against the Texas Department of Criminal Justice ("TDCJ") alleging violations of the Eighth Amendment. 956 F.3d at 799. In response to the COVID-19 pandemic, TDCJ had taken preventative measures such as providing "access to soap, tissues, gloves, [and] masks," implementing "regular cleaning," "quarantin[ing] of new prisoners," and ensuring "[physical] distancing during transport." *Id.* at 802. The Fifth Circuit determined that the district court applied the wrong legal standard by "collaps[ing] the objective and subjective components of the Eighth Amendment inquiry" by "treating inadequate measures as dispositive of the Defendants' mental

8

        state" under the subjective prong and held that "accounting for the protective measures TDCJ has taken" the plaintiffs had not shown deliberate indifference. *Id.* at 802-03.  In *Marlow*e, the Fifth Circuit relied on its reasoning in *Valentine* and again reiterated that there was "little basis for concluding that [the correctional center's] mitigation efforts," which included "providing prisoners with disinfectant spray and two cloth masks[,] . . . limiting the number of prisoners in the infirmary lobby[,] and painting markers on walkways to promote [physical] distancing," were insufficient.  2020 WL 2043425, at *2-3.

*Id.* at *9.

        The *Wilson* Court stated that even if the BOP's response to COVID-19 was inadequate, it took many affirmative actions to not only treat and quarantine inmates who had tested positive, but also to prevent widespread transmission of COVID-19.  The Court held that because the BOP had neither disregarded a known risk nor failed to take steps to address the risk, it did not act with deliberate indifference in violation of the Eighth Amendment.  *Id.* at *11.

        In addition, in *Cameron, et al. v. Bouchard, et al.,* No. 20-3447, ___ F. App'x ___, 2020 WL 3100187 (6th Cir. Jun. 11, 2020), the Court relied on *Wilson* to find that pretrial detainees in the Oakland County Jail were unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims.  The plaintiffs in *Cameron* claimed that jail officials were deliberately indifferent to the substantial risk of harm posed by COVID-19 at the jail.  The district court initially granted a preliminary injunction requiring the defendants to "(1) provide all jail inmates with access to certain protective measures and medical care intended to limit exposure, limit transmission, and/or treat COVID-19, and (2) provide the district court and Plaintiffs' counsel with a list of medically vulnerable inmates within three business days."  *Id.* at *1.  However, following the decision in *Wilson*, the Court granted the defendants' renewed emergency motion to stay the preliminary injunction, finding that the preventative measures taken by the defendants were similar to those taken by officials in *Wilson* and, thus, were a reasonable response to the threat posed by COVID-19 to the plaintiffs.  *Id.* at *3.

In the instant case, Plaintiff claims that MDOC officials' handling of the COVID-19 crisis violated his Eighth Amendment rights while he was confined at KCF. The Court notes that as of the date that this opinion is being written, there has been only one confirmed case of a prisoner with COVID-19 at KCF. (*See* https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337.) Moreover, since Plaintiff filed his complaint, he has been transferred to URF, which has zero confirmed cases. (*Id.*) The Court notes that the MDOC has taken significant measures to limit the threat posed by COVID-19. These measures include:

- **Personal Protective Equipment, cleaning and mitigation measures**
- Michigan State Industries has produced masks for all prisoners and correctional facility staff to wear. Each employee and prisoner received three masks each and the masks can be laundered and worn again. Facility staff are also permitted to bring their own PPE, such as masks, gloves and gowns. Staff are expected to wear their mask during their entire shift and prisoners are expected to also wear their masks at all times, except while eating, sleeping or showering. Michigan State Industries is also manufacturing gowns, protective eyewear and protective suits.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning. Facilities have enhanced cleaning efforts and cleaning products are available to clean commonly-used areas and phones before and after use. Cleaning efforts have been doubled at facilities with vulnerable prisoner populations. We have increased our production of soap and ensured that all prisoner areas and bathrooms have plentiful access to soap. Soap has been distributed to prisoners and prisoners have been told that if they need more soap they only need to ask. Additional soap will be provided at no charge. CDC posters detailing proper hygiene practices have been posted in correctional facilities and have also been recreated digitally so they play on TV screens throughout our facilities. These are the same posters you will see in your community and throughout State of Michigan office buildings.
- Movements have been modified to help facilitate social distancing and the number of prisoners attending classes and meals has been reduced so prisoners can be seated farther apart. Prisoners and staff are frequently reminded of the need for social distancing and prisoners are instructed not to gather in groups on the yard. Activities such as basketball and weight pit have been suspended to encourage social distancing, as well. There are also markers and cones set up for med lines and in the chow hall as a visual reference for prisoners on how far apart they should stand.
- The department has been leading the nation when it comes to consistent testing of the prisoner population when they have symptoms. We have now started a system of expanded

testing beginning at Lakeland Correctional Facility. All prisoners at Lakeland are expected to be tested by the end of the week of April 19 and testing is expected to begin at G. Robert Cotton Correctional Facility the week of April 26.
- **Visits and Transfers**
- Visitation at facilities statewide was suspended as of March 13.
- The department worked with communication vendors GTL and JPay to provide enhanced services for prisoners to communicate with family and friends during the period without visits. Detailed information from those companies is being relayed to the prisoner population. JPay is continuing to offer two free stamps per week through June 2, 2020. GTL is providing one free, five-minute phone call every seven days for the first two weeks of May 2020 and, for the entire month of May, GTL will reinstate the internet and mobile fees with reduced rates. The regular $2.95 transaction fee has been reduced to $1.95 and the $.95 transaction fee has been reduced to $0.95. We will continue to work with the companies on anything else they may be willing to provide.
- In connection with visitation suspension, face-to-face college classes at all facilities have also been suspended effective immediately. The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses. Core programming and school classes taught by MDOC staff will continue.
- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol. Attorney visits will continue to be authorized.
- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.
- Transfers of offenders with new sentences from county jails in the community have been suspended. The department also issued protocol to all county sheriff offices to offer guidance on screening and other preventative measures.
- **Quarantine and Care of Sick Prisoners**
- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC can test the prisoner.
- Prisoners who test positive for the virus are isolated from the general population and any prisoners or staff they have had close contact with are identified and notified of the need to quarantine.
- Prisoners who test positive will be transferred to one of the department's designated quarantine units at either G. Robert Cotton Correctional Facility, Carson City Correctional Facility or the former Maxey Annex, which is located near Woodland Center Correctional Facility. The Maxey Annex previously housed juvenile offenders under the jurisdiction of MDHHS, prior to its closure, and the MDOC had been working to convert it to a training site. These units are in buildings that are completely separated from each of the correctional facilities. They have limited movement and access to these units is extremely limited. Only a small number of designated staff work in the unit in 12-hour shifts to limit the number of people entering. Those staff members report directly to the unit and do not enter the main correctional facility. Prisoners transferred to the unit also stay on the unit and do not enter any other areas of the prison.

- Prisoners who have been identified as having close contact with another prisoner who tests positive, but have not tested positive for the virus themselves, will be isolated from the general population at their facility for the 14-day quarantine period.
- Co-pays for prisoners who need to be tested for COVID-19 have been waived.
- Prisoners have been urged to notify healthcare if they are sick or experiencing symptoms of illness so they can be evaluated. Prisoners who require outside medical attention will be transported to an area hospital for treatment.
- **Recovery**
- Prisoners are considered in step-down status when they no longer have symptoms, are no longer considered contagious and have been medically cleared by our chief medical officer.
- A unit has also been established at Central Michigan Correctional Facility for recovered prisoners who previously tested positive for the virus. These prisoners are considered officially recovered by the Michigan Department of Health and Human Services, have no symptoms, are not considered contagious, have been medically cleared by the MDOC's chief medical officer, and must test negative before they are moved to the unit at Central. Not all of the prisoners coming to Central's unit will come from Gus Harrison Correctional Facility's step-down unit. With the number of prisoners who are placed at the COVID positive units at Macomb Correctional Facility, G. Robert Cotton Correctional Facility and Carson City Correctional Facility, not all will move to Gus Harrison Correctional Facility, given there are only 120 beds in the facility's step-down unit. It is possible prisoners will come from other locations, but ONLY if they have since tested negative, and it has been 28 days at least since the onset of their symptoms. The department is NOT sending COVID-19 positive prisoners to Central.
- **Parole Information**
- The MDOC Parole Board continues to hold parole hearings and is reviewing all eligible cases to determine prisoners who can be safely released at this time. In addition, the department will begin holding remote public Parole Board hearings for parolable life sentence and clemency cases. You can find more information on scheduled hearings and how to participate here.
- The department continues to review individual cases and the Parole Release Unit is working to process parole releases for prisoners with positive parole decisions as quickly and safely as possible.
- We are no longer allowing parole representatives to enter correctional facilities for parole hearings as an additional step to limit the potential introduction of illness. However, individuals designated by a prisoner as a parole representatives should contact the facility where the prisoner is being housed to find out about options to call in for the hearing.
- The Parole Board is aware that prisoners do not have access to certain programming and the Board is taking that into consideration. If there are changes in the prisoner's case, the prisoner will be notified directly.
- We continue to monitor the prisoner population, our parole and probation population and the parole process as this pandemic continues, in order to consider all options to ensure the safety of offenders under our supervision.
- All of our paroles are done with public safety in mind. The Parole Board looks at each individual on a case-by-case basis and will only grant a parole if they believe that person will not be a harm to society.

- All prisoners set to parole must take a Covid-19 test before being released. The MDOC is working to expedite the parole release of those individuals who can safely and legally be released at this time. There are a number of steps that are included in the parole release process, which now includes testing for COVID-19 to ensure the individual will not pose a risk to loved ones or the community upon release. As a result, a limited number of parole dates may be changed to accommodate these processes. If a prisoner tests positive they will not parole until they are cleared by healthcare, which is at least 14 days from the onset of symptoms. Prisoners who test negative will be paroled as scheduled.
- **Staff Measures and Information**
- The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can. Employees should have been authorized to telecommute by their supervisor and supervisors who have questions should contact their leadership. No employees who have been ordered to telecommute should return to their work site unless authorized to do so by their deputy director or Director Washington. Employees who are telecommuting should complete required online training during this time.
- ALL correctional facility employees continue to report to work. Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution. We need to continue to keep prisoners engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities. Thank you to our correctional facility staff for all they do to keep the citizens of our state safe.
- Anyone entering facilities will be subject to enhanced screening prior to entering. This includes answering screening questions and having their temperatures taken. Anyone suspected of having symptoms will not be allowed in the facility.
- The Michigan Correctional Officers' Training Council has supported the Department's request to extend the period for obtaining necessary college credits to 24 months from date of hire. Officers who are deficient in their college credits will now have 24 months from their date of hire to complete the required college credits, rather than 18. This change allows officers extra time during this period of uncertainty.
- All employees who are working on location at one of our prisons will receive $750 in COVID-19 premium pay, per pay period during the course of this event.
- As the state works to limit the spread of the virus, we caution employees not to let fear lead to discriminatory actions against any individuals based on their disability, race or ethnicity. If you have experienced or witnessed discriminatory harassment or discrimination, we want you to know it will not be tolerated and we strongly encourage you to report it by calling the MDOC Equal Employment Opportunity Office at 1-800-326-4537, 517-335-3654, or by contacting MDOC EEO Officer Toya Williams at 517-335-4125 or williamst8@michigan.gov.
- **Operational Changes**
- Corrections Transportation Officers or other department staff will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.
- No out-of-state business travel will be allowed until further notice. All in-state business travel should be for essential matters only.
- Most construction projects have been placed on hold. Each project will be evaluated on a case-by-case basis.

- Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible. Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.

(*Id.*) Further, the MDOC issued a COVID-19 DOM on April 8, 2020, and issued a revised DOM on the subject on May 26, 2020, *see* MDOC DOM 2020-30R2 (eff. May 26, 2020), and again on May 27, 2020, *see* MDOC DOM 2020-30R3 (eff. May 27, 2020) (serially outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer).

Plaintiff does not allege that he has come into contact with any individual who has COVID-19. The MDOC has taken extensive steps to address the risk of COVID-19 to inmates statewide. As noted by the Sixth Circuit in *Wilson*, such actions demonstrate the opposite of a disregard of a serious health risk. *Wilson*, 2020 WL 3056217, at *8. Although the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, he has failed to allege facts showing that Defendants' handling of the COVID-19 crisis violated his Eighth Amendment rights.

**VI. Motion for a Temporary Restraining Order**

Plaintiff has filed a motion for a temporary restraining order (ECF No. 2) seeking immediate release to home confinement. However, because Plaintiff has failed to state a claim upon which relief may be granted, his motion is properly denied as moot.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C.

§1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  The Court does not certify that an appeal would not be in good faith.

Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:    September 9, 2020              /s/ Robert J. Jonker
                                                       ROBERT J. JONKER
                                                       CHIEF UNITED STATES DISTRICT JUDGE